# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| RONALD PEABODY, a single person, | No. 52891-6-II |
| Appellant, | |
| v. | |
| JON TUNISON and ROXANNE TUNISON, husband and wife; LIBERTY BAY BANK, a Washington Bank; and MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC., as nominee for CALIBER HOME LOANS, INC., | UNPUBLISHED OPINION |
| Respondents. | |

MELNICK, J. — Ronald Peabody owned property in Kitsap County and had a nonexclusive septic utility easement on his neighbors' property. A drainfield easement agreement created the easement. Jon and Roxanne Tunison owned the servient property. The Tunisons also owned a shed and mobile home located within the easement area.

After the Tunisons refused to remove the shed and mobile home, Peabody sued them alleging that the shed and mobile home unlawfully encroached on the easement. The Tunisons moved for summary judgment, and the trial court granted their motion and dismissed Peabody's case. The court also awarded the Tunisons attorney fees and costs under RCW 4.84.330.

We affirm.

FACTS

Peabody and the Tunisons owned adjacent properties and were parties to a drainfield easement agreement. The easement agreement granted Peabody "a nonexclusive easement for utilities" allowing him to utilize a portion of the Tunisons' property as a drainfield for his onsite sewage system. Clerk's Papers (CP) at 31. The easement agreement required that Peabody maintain the drainfield and bear the "cost of monitoring, maintaining and repairing [the drainfield]." CP at 31. The agreement also contained an attorney fee provision, which provided: "In the event that any action is filed in relation to this Agreement . . . the unsuccessful party in the action shall pay to the successful party . . . all costs of enforcement and reasonable attorney fees and costs." CP at 33.

The Kitsap County Board of Health Ordinance 2008A-01 (Health Ordinance) required that Peabody obtain annual inspections and monitoring of his septic system. It also required that Peabody submit reports of the information obtained to the Kitsap County Health District (Health District). HEALTH ORDINANCE 2008A-01 § 13(C)(15)(b). Annual reports from 2014, 2015, and 2016 found no deficiencies in Peabody's septic system and no improper encroachments.

In March 2017, Peabody wrote a letter to the Tunisons indicating his belief that their shed and mobile home located in the easement area constituted unlawful encroachments. He instructed the Tunisons to remove them.

Around the same time, Peabody sent a letter to the Health District identifying the allegedly unlawful encroachments. According to Peabody, the letter "serve[d] as formal demand that Kitsap County take immediate action to require the removal of any and all encroachments from the drainfield easement area." CP at 399. The Health District responded that it knew of no Health Ordinance violations.

2

Subsequently, on March 30, Peabody's 2017 annual report stated that the Tunisons' shed and mobile home were "[i]mproper encroachments." CP at 395.

On April 21, Peabody sued the Tunisons. Peabody alleged that the shed and mobile home constituted unlawful encroachments. According to Peabody, "[t]he entire subject easement area was designated for [his] beneficial use." CP at 7. Therefore, Peabody alleged that the Tunisons, by not removing their shed and mobile home, had damaged his property value in an amount to be proven at trial. Peabody also sought injunctive relief requiring the Tunisons to remove the structures.

Around the same time, Peabody submitted a property conveyance application to the Health District.[1] The application stated that the Tunisons' shed and mobile home encroached on Peabody's drainfield.

On April 26, relying on Peabody's 2017 annual report, the Health District issued its evaluation report for Peabody's property conveyance application. The Health District stated that the Tunisons' shed and mobile home violated the Health Ordinance.

But two days later, the Health District issued a revised evaluation report. The Health District, via environmental health director John Kiess, stated:

> The property conveyance report issued on April 26, 2017, incorrectly noted an item of non-compliance based on an erroneous inspection report submitted by the septic maintenance provider. There are no items of non-compliance or known violations of [the Health Ordinance] occurring at this time.

CP at 196. Kiess then sent Peabody's maintenance company a message stating that the shed and mobile home were not unlawful encroachments and asking them to submit a new report.

---

[1] A property conveyance application occurs when an owner intends to convey ownership of property that utilizes an onsite sewage system. HEALTH ORDINANCE 2008A-01 § 13(D). The Health District then inspects the property, conducts a review of the property records, and issues a written summary and evaluation report. HEALTH ORDINANCE 2008A-01 § 13(D).

3

Peabody's maintenance company subsequently submitted a new annual report finding no deficiencies in Peabody's septic system and no improper encroachments.

In August, Peabody obtained a survey map from WestSound Engineering. The map indicated that the shed and mobile home were not located on Peabody's drainfield.

During the course of litigation, Kiess authored multiple declarations. In his first declaration, authored in August, Kiess stated that "the existence of the [Tunisons' shed and mobile home did] not constitute a violation of the Board of Health's regulation, and the Health District's records demonstrate[d] such encroachments [were] not impacting the proper functioning of Mr. Peabody's [onsite sewage system]." CP at 203. Kiess confirmed that the Health District's April 26 evaluation report was the result of an erroneous annual report submitted by Peabody's maintenance company.

Subsequently, Kiess received WestSound Engineering's map and compared it with the original septic system design that the Health District approved. After reviewing the map, Kiess submitted his third declaration, stating:

> I reviewed the Health District approved original septic system design and the Health District approved septic system installation drawing ("as-built") in comparison to the August 17, 2017, exhibit map of the drainfield easement area. Based on those documents, it appears that the north orientation of the original design drawing is incorrect and the primary septic drainfield was installed approximately ninety (90) degrees out of orientation to the approved septic design. If correct, the approved reserve drainfield area may be located in the area of the existing shed and mobile home.
>    . . . If the approved reserve drainfield area is located in the area of the existing shed and mobile home, the requirements of [the Health Ordinance] are being violated.
>    . . . Since the review of these documents, the Health District has not conducted an onsite visit to verify if the septic system was installed out of orientation to the approved design nor has the Health District pursued any enforcement action.

CP at 207-08.

On September 28, the Tunisons deposed Peabody. Peabody admitted in his deposition that his septic system functioned properly. However, Peabody also expressed his belief that the shed and mobile home unlawfully restricted his ability to expand his septic system and drainfield.

On October 13, after learning that Peabody planned to expand his drainfield, the Tunisons sent the Health District a letter. The letter stated that if the Health District determined that the shed and mobile home impaired any application for the modification of Peabody's onsite sewage system, then the Tunisons would remove that structure.

In February 2018, approximately ten months after filing suit, Peabody submitted an application to the Health District to expand his septic system. Shortly thereafter, the Health District approved Peabody's application. The approval letter stated, in relevant part: "Structures that are encroaching upon the designated installation areas must be moved no later than the time of installation." CP at 466. The Tunisons removed the shed and mobile home before Peabody installed the new system.

Subsequently, the Tunisons moved for summary judgment. The Tunisons argued that no genuine issues of material fact existed as to whether the shed and mobile home violated the easement agreement.

In his response to the Tunisons' motion, Peabody argued that the Tunisons' shed and mobile home violated the Health Ordinance and that he "was required and had the responsibility to initiate this litigation." CP at 500. According to Peabody, a breach of the Health Ordinance constituted a breach of the easement agreement.

After hearing argument, the court granted the Tunisons' motion. The court did not decide any attorney fees issues.

The Tunisons then moved for attorney fees and costs and a final order of dismissal. Peabody also moved for attorney fees and costs. The trial court granted the Tunisons' motion and awarded them fees under RCW 4.84.330. The court then entered a final judgment and order of dismissal in their favor. Peabody appeals.

## ANALYSIS

### I. LEGAL PRINCIPLES

We review an order for summary judgment de novo, performing the same inquiry as the trial court. *Aba Sheikh v. Choe*, 156 Wn.2d 441, 447, 128 P.3d 574 (2006). "We consider all facts submitted and all reasonable inferences from the facts in the light most favorable to the nonmoving party." *Rublee v. Carrier Corp.*, 192 Wn.2d 190, 199, 428 P.3d 1207 (2018). "Summary judgment is proper when the record demonstrates there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *Munich v. Skagit Emergency Commc'ns Ctr.*, 175 Wn.2d 871, 877, 288 P.3d 328 (2012).

"Generally speaking, expert opinion on an ultimate question of fact is sufficient to establish a triable issue and defeat summary judgment." *Strauss v. Premera Blue Cross*, 194 Wn.2d 296, 301, 449 P.3d 640 (2019). "However, 'speculation and conclusory statements will not preclude summary judgment.'" *Strauss*, 194 Wn.2d at 301 (quoting *Volk v. DeMeerleer*, 187 Wn.2d 241, 277, 386 P.3d 254 (2016)).

The primary objective of contract interpretation is to ascertain the mutual intent of the parties at the time they executed the contract. *Int'l Marine Underwriters v. ABCD Marine, LLC*, 179 Wn.2d 274, 282, 313 P.3d 395 (2013). Washington follows the "objective manifestation theory" of contract interpretation, under which the focus is on the reasonable meaning of the contract language to determine the parties' intent. *Hearst Commc'ns, Inc. v. Seattle Times Co.*,

154 Wn.2d 493, 503, 115 P.3d 262 (2005). "We generally give words in a contract their ordinary, usual, and popular meaning unless the entirety of the agreement clearly demonstrates a contrary intent." *Hearst*, 154 Wn.2d at 504.

We review questions of statutory interpretation de novo. *Flight Options, LLC v. Dep't of Revenue*, 172 Wn.2d 487, 495, 259 P.3d 234 (2011). In interpreting statutes, "[t]he goal . . . is to ascertain and carry out the legislature's intent." *Jametsky v. Olsen*, 179 Wn.2d 756, 762, 317 P.3d 1003 (2014). We give effect to the plain meaning of the statute as "derived from the context of the entire act as well as any 'related statutes which disclose legislative intent about the provision in question.'" *Jametsky*, 179 Wn.2d at 762 (quoting *Dep't of Ecology v. Campbell & Gwinn, LLC*, 146 Wn.2d 1, 11, 43 P.3d 4 (2002)).

If a statute's meaning is plain on its face, we must give effect to that meaning as an expression of legislative intent. *Blomstrom v. Tripp*, 189 Wn.2d 379, 390, 402 P.3d 831 (2017). However, if "after this inquiry, the statute remains ambiguous or unclear, it is appropriate to resort to canons of construction and legislative history." *Blomstrom*, 189 Wn.2d at 390. "A statute is ambiguous if 'susceptible to two or more reasonable interpretations,' but 'a statute is not ambiguous merely because different interpretations are conceivable.'" *HomeStreet, Inc. v. Dep't of Revenue*, 166 Wn.2d 444, 452, 210 P.3d 297 (2009) (quoting *State v. Hahn*, 83 Wn. App. 825, 831, 924 P.2d 392 (1996)).

II. NO BREACH OF DRAINFIELD EASEMENT OR HEALTH ORDINANCE

Peabody argues that the trial court erred in granting summary judgment because genuine issues of material fact existed as to whether the Tunisons breached their duties under the easement agreement and violated Peabody's rights. Peabody also claims that the shed and mobile home were unlawful encroachments under the Health Ordinance. We disagree.

7

A.      Easement Agreement

Peabody argues that the Tunisons "breached their duties under the easement agreement" when they refused to remove the shed and mobile after Peabody requested that they do so. Br. of Appellant at 19. We disagree.

"Easements are property rights or interests that give their holder limited rights to use but not possess the owner's land." *State v. Newcomb*, 160 Wn. App. 184, 191, 246 P.3d 1286 (2011). Nonexclusive easements allow the owner of the property to use the property in any way that does not impair the easement holder's rights. *City of Raymond v. Willapa Power Co.*, 102 Wash. 278, 281, 172 P. 1176 (1918); *Beebe v. Swerda*, 58 Wn. App. 375, 384, 793 P.2d 442 (1990).

Peabody possessed a nonexclusive use utility easement for a drainfield on property the Tunisons owned. The easement agreement required that Peabody maintain the drainfield and bear the "cost of monitoring, maintaining and repairing [the drainfield]." CP at 31. Therefore, under the terms of the easement agreement, the Tunisons could use the property in any way they wished, as long as it did not impair Peabody's rights under the agreement. *City of Raymond*, 102 Wash. at 281.

Peabody admitted in his deposition that his septic system functioned properly. The Health District understood that Peabody's septic system functioned properly. No evidence exists that the structures impaired Peabody's ability to monitor, maintain, or repair the drainfield. In fact, Peabody has never specified which provision of the agreement he alleges the Tunisons breached. It is unclear.

Peabody did state in his deposition that the structures impaired his ability to expand his drainfield. But Peabody never amended his complaint to allege this claim, and his decision to expand only became known after he filed suit. Furthermore, the evidence shows that, upon

learning that Peabody sought to expand his drainfield, the Tunisons sent the Health District a letter, which stated that if the Health District determined that the shed or mobile home impaired an application submitted by Peabody to modify his septic system, the Tunisons would remove the structures. The Health District approved Peabody's application to expand the septic system conditioned on the Tunisons removing the shed and mobile home. The Tunisons then removed the shed and mobile home. Thus, the Tunisons' shed and mobile home did not impair or hinder the expansion of Peabody's septic system.

There is no evidence that the Tunisons breached the easement agreement.

### B. Health Ordinance

Peabody argues that the Tunisons' Health Ordinance violation "was but one of the factors that required [him] to take action and ultimately, bring suit." Reply Br. of Appellant at 3. Peabody's argument seems to be as follows. The Health Ordinance imposed on Peabody a duty to protect his easement area from encroachments. And the Health Ordinance imposed on the Tunisons a duty to "cooperate" with him to conform to the regulations contained in the ordinance. Therefore, according to Peabody, the Tunisons had a duty to cooperate with him in removing the shed and mobile home, i.e., the encroachments. Assuming this argument is the one he makes, we disagree.

Peabody's argument overlooks the fact that any legal duty on the part of the Tunisons is owed to the Health Officer, not to him. "Under the age old rule expressio unius est exclusio alterius, '[w]here a statute specifically designates the things upon which it operates, there is an inference that the Legislature intended all omissions.'" *State v. LG Electronics, Inc.*, 186 Wn.2d 1, 9, 375 P.3d 636 (2016) (alteration in original) (internal quotation marks omitted) (quoting *In re Pers. Restraint of Hopkins*, 137 Wn.2d 897, 901, 976 P.2d 616 (1999)).

Section 2(A) of the Health Ordinance provides that "[t]he Health Officer shall administer and enforce" the ordinance. Nowhere does Health Ordinance authorize or require a private landowner to sue another private landowner for alleged violations of the Health Ordinance. Nor does the Health Ordinance authorize a private cause of action for an alleged violation.

Accordingly, we conclude that the Health Officer has the sole authority to enforce the Health Ordinance, and the ordinance neither provided Peabody a cause of action nor should it have been "one of the factors" that Peabody considered in deciding that he was "required" to bring suit. Reply Br. of Appellant at 3. Furthermore, even if the ordinance was relevant to Peabody's suit, we conclude that no violation occurred.

The only alleged evidence of a violation stems from Kiess's third declaration. However, this declaration was speculative, stating that the shed and mobile home *may* be in the drainfield reserve area, and if they were, they would constitute unlawful encroachments. Peabody had ample opportunity, approximately seven months, between the time Kiess authored this declaration and the Tunisons moved for summary judgment to verify whether the shed and mobile home were in fact located on the drainfield reserve area. No evidence suggests they were. Instead, the evidence shows that the Health District did not view the shed and mobile home as unlawful encroachments.

III.    ATTORNEY FEES

Peabody argues that the trial court erred in awarding attorney fees and costs to the Tunisons under RCW 4.84.330. Peabody contends that because the easement agreement contained a bilateral attorney fee provision, RCW 4.84.330 does not apply to this case. Under the terms of the easement agreement, Peabody argues that the Tunisons were not the "successful party" because his goal in the litigation was getting the shed and mobile home removed, which they were. We agree that the court should not have awarded fees under RCW 4.84.330. However, we may affirm

on any grounds. *Blue Diamond Grp., Inc. v. KB Seattle 1, Inc.*, 163 Wn. App. 449, 453, 266 P.3d 881 (2011).

A.    Legal Principles

"In Washington, attorney fees may be awarded only when authorized by a private agreement, a statute, or a recognized ground of equity." *Labriola v. Pollard Grp., Inc.*, 152 Wn.2d 828, 839, 100 P.3d 791 (2004). We review the trial court's application of court rules and statutes authorizing attorney fee awards de novo. *Niccum v. Enquist*, 175 Wn.2d 441, 446, 286 P.3d 966 (2012).

B.    RCW 4.84.330

Peabody argues that RCW 4.84.330 does not apply because that statute only applies to unilateral attorney fees contract provisions and here the contract provision was bilateral, i.e., enforceable by either party. We agree.

RCW 4.84.330 provides in pertinent part:

> In any action on a contract or lease entered into after September 21, 1977, where such contract or lease specifically provides that attorneys' fees and costs, which are incurred to enforce the provisions of such contract or lease, shall be awarded to one of the parties, the prevailing party, whether he or she is the party specified in the contract or lease or not, shall be entitled to reasonable attorneys' fees in addition to costs and necessary disbursements.

However, when a contract includes a bilateral attorney fees provision, "it is the terms of the contract to which the trial court should look to determine if such an award is warranted." *Kaintz v. PLG, Inc.*, 147 Wn. App. 782, 790, 197 P.3d 710 (2008). "[W]here . . . the agreement already contains a bilateral attorneys' fee provision, RCW 4.84.330 is generally inapplicable." *Hawk v. Branjes*, 97 Wn. App. 776, 780, 986 P.2d 841 (1999); *see also Walji v. Candyco, Inc.*, 57 Wn. App. 284, 287-88, 787 P.2d 946 (1990) (where contract at issue contains a bilateral attorney fees

11

clause, the statutory "prevailing party" provision of RCW 4.84.330 does not control over the contract's plain language).

Here, the easement agreement provided: "In the event that any action is filed in relation to this Agreement . . . the unsuccessful party in the action shall pay to the successful party . . . all costs of enforcement and reasonable attorney fees and costs." CP at 33. Because, under the easement agreement, either party can bring suit and either party can be awarded attorney fees and costs in that suit, we conclude that easement agreement contained a bilateral attorney fee provision. *See Kaintz*, 147 Wn. App. at 784; *Quality Food Ctrs. v. Mary Jewell T, LLC*, 134 Wn. App. 814, 818, 142 P.3d 206 (2006).

The Tunisons cite *Mike's Painting, Inc. v. Carter Welsh, Inc.*, 95 Wn. App. 64, 975 P.2d 532 (1999), and *State v. Farmers Union Grain Co.*, 80 Wn. App. 287, 908 P.2d 386 (1996), for the proposition that courts in these cases applied RCW 4.84.330 to bilateral contracts. However, both cases are distinguishable.

In *Mike's Painting*, the contract provided: "In any dispute between Contractor and Subcontractor, the prevailing party shall be awarded its reasonable attorneys' fees and costs." 95 Wn. App. at 66. Because either party could bring suit and in that suit either party could be awarded attorney fees, the provision was bilateral. However, at issue in *Mike's Painting* was not whether attorney fees were properly awarded under RCW 4.84.330, but rather, when both parties prevailed on certain claims, whether an arbitration panel's decision to award fees to both parties and offset them was proper. 95 Wn. App. at 67. Thus, the court relied on RCW 4.84.330 to analyze whether the offset was proper, not whether attorney fees were authorized under the statute.

Peabody attempts to distinguish the Tunisons' use of *Mike's Painting* by noting that the contract at issue there used the language of "prevailing party." Reply Br. of Appellant at 12.

12

Peabody contends that RCW 4.84.330 applied in *Mike's Painting* because the contract incorporated the statute. Peabody's reasoning runs contrary to *Walji*, where the court stated that the definition of "prevailing party" in RCW 4.84.330 should not be used to interpret a lease provision containing identical language. 57 Wn. App. at 288. Regardless, as discussed above, we conclude that *Mike's Painting* does not support the proposition that the Tunisons give to it.

The Tunisons next rely on *Farmers Union*. In *Farmers Union*, the court only quoted a portion of the attorney fee provision from the contract. The court stated that "[t]he attorney fees paragraph at issue . . . provides for reasonable attorney fees, costs and expenses '[i]f either party brings suit to enforce or interpret any provision of this Lease.'" *Farmers Union*, 80 Wn. App. at 295 (second alteration in original). Thus, although either party could bring suit, under the provision a defending party could never obtain fees no matter how frivolous the claim. Therefore, the contract provision at issue in *Farmers Union* was unilateral, and RCW 4.84.330 applied. *See Quality Food Centers*, 134 Wn. App. at 818 ("[I]t is the one-sidedness of the availability of fees in the particular controversy that makes the provision unilateral.").

Because the provision here is a bilateral attorney fee provision, we conclude that RCW 4.84.330 does not apply and the trial court erred.

C.      Attorney Fee Provision in Easement Agreement

As noted above, the attorney fees provision in the easement agreement provided: "In the event that any action is filed in relation to this Agreement . . . the unsuccessful party in the action shall pay to the successful party . . . all costs of enforcement and reasonable attorney fees and costs." CP at 33.

13

"Successful" is defined as "resulting or terminating in success." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 2282 (2002). "Success" is defined as "the degree or measure of obtaining a desired end." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 2282.

Peabody sued the Tunisons, alleging their shed and mobile home were unlawful encroachments. The complaint sought damages from the Tunisons and injunctive relief requiring them to remove the structures. The Tunisons prevailed at summary judgment, and the trial court dismissed Peabody's claims.

However, Peabody contends that the real reason for his suit was to have the Tunisons remove the shed and mobile home, which they did. Therefore, Peabody argues that he was the "successful party." We disagree.

Peabody's *lawsuit* was not successful. Rather, events that occurred independent of the lawsuit are what caused the Tunisons to remove the shed and mobile home. When the Tunisons learned that Peabody sought to expand his septic system and corresponding drainfield, they sent the Health District a letter stating that if the Health District determined that the shed and mobile home impaired Peabody's ability to modify his septic system, the Tunisons would remove the structures. The Health District subsequently approved Peabody's application to expand his septic system but noted that the Tunisons' shed and mobile home "must be moved no later than the time of installation." CP at 466. The Tunisons complied and removed the shed and mobile home prior to installation.

Thus, while Peabody may argue that he obtained his end result, that end result was not the product of his lawsuit. Instead, it was the result of acts and events occurring independently of the lawsuit. Those independent acts were unrelated to the claims made in Peabody's lawsuit.

14

Therefore, we conclude that the Tunisons were the "successful party" in this lawsuit, and we affirm the trial court's award of attorney fees under the attorney fee provision in the easement agreement.

Both Peabody and the Tunisons request an award of attorney fees on appeal.

RAP 18.1(a) provides that "[i]f applicable law grants to a party the right to recover reasonable attorney fees or expenses on review before either the Court of Appeals or Supreme Court, the party must request the fees or expenses."

We conclude that the Tunisons are the successful party on appeal. Therefore, awarding them attorney fees on appeal is appropriate under the terms of the easement agreement. *Kaintz*, 147 Wn. App. at 790-91. As a result, we grant the Tunisons' request subject to compliance with RAP 18.1(d).

We affirm.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

_____
Melnick, J.

We concur:

_____
Worswick, J.

_____
Lee, C.J.